Sosman, J.
Plaintiffs Bradford Baron and Alan Morovitz have brought the present action against their *16 former lawyers, defendants Flynn, Sheridan and Tabb (“FS&T”), complaining of legal malpractice, breach of contract, misrepresentation, conspiracy and unfair and deceptive trade practices. FS&T has filed pro se a counterclaim against Morovitz and a third-party claim against Murray Reiser, Morovitz’ current attorney, complaining that Morovitz breached his contract with them and that attorney Reiser wrongfully interfered with that contractual relationship. FS&T has moved to dismiss the counts for misrepresentation and conspiracy (Counts XII, XIII, VII and VIII). Morovitz and Reiser have moved to dismiss all claims in FS&T’s counterclaim and third-party complaint. For the following reasons, FS&T’s motion to dismiss is denied, Morovitz’ motion to dismiss the counterclaim is allowed, and Reiser’s motion to dismiss the third-party complaint is allowed.
Background
In their amended complaint, Baron and Morovitz allege that they were formerly employed at Brest Buick in Lynn (“Brest”). Brest was a major competitor of defendant Smyly Autos, Inc. (“Smyly”). In the course of his employment, Baron claims that he became aware of various illegal practices at Brest, including odometer tampering. Baron voiced his concerns about these practices to his superiors at Brest. Brest discharged him shortly thereafter in June 1988.
In the winter of 1989, Baron became employed at Smyly. In the meantime, he retained counsel to represent him in a claim against Brest for wrongful termination. Baron’s superiors at Smyly began to take considerable interest in Baron’s wrongful termination claim against Brest, encouraging him to pursue that claim vigorously and questioning him continually about its progress. They also pressed Baron for further information about odometer tampering at Brest, and convinced Baron to disclose to them the identity of another employee at Brest who had knowledge of these practices. That employee was plaintiff Morovitz.
Ultimately, Smyly arranged for Baron and Morovitz to meet with Smyly’s own attorneys at FS&T. In addition to representing Smyly, FS&T represented a group of Brest customers who were preparing to bring their own claims against Brest in a class action. In the course of these discussions, Baron and Morovitz expressed concern that by providing this information against Brest and /or by vigorously pursuing their own claims against Brest, Morovitz would lose his job and both he anu Baron would be “blackballed” in the retail auto industry. They claim that, in response to these concerns, Smyly and FS&T assured both of them employment at Smyly in exchange for their cooperation in providing such damaging evidence of Brest’s wrongdoing. Morovitz, as directed by FS&T and Smyly, then proceeded to confront his superiors at Brest and, like Baron, he was discharged.
At Smyly’s urging, Baron discharged his original lawyer in his wrongful termination claim and retained FS&T as successor counsel. He and Morovitz signed a contingency fee agreement with FS&T to have FS&T represent them in their claims against Brest.
FS&T was simultaneously preparing the class action complaint on behalf of customers defrauded by Brest’s practices. With the filing of that complaint, FS&T and Smyly wished to generate considerable publicity adverse to Brest. Much of the information in that complaint, and in that publicity, was provided to FS&T and Smyly by Baron and Morovitz.
Baron and Morovitz objected to participating in this publicity campaign, arguing that if Brest were driven out of business they would not be able to collect anything for their wrongful termination claims. They again expressed concern about their position in the industry. FS&T assured them that they did not have to worry about that because there was insurance coverage of $1,000,000 for their wrongful termination claims against Brest, and FS&T and Smyly again assured them of employment at Smyly. Relying on those assurances, Baron and Morovitz cooperated in the FS&T/Smyly publicity campaign disparaging Brest.
As matters progressed, Smyly and FS&T began to express the fear that the employment of Baron and Morovitz at Smyly would potentially expose all of them to claims of conspiracy and/or other wrongful trade practices by Brest. Arrangements were made to temporarily “discharge” Baron and Morovitz and then re-employ them in future. Those arrangements included some documentation treating Baron as being on a leave of absence. Baron and Morovitz were still promised permanent employment in exchange for their cooperation in helping with the class action suit and the adverse publicity against Brest.
Brest ultimately filed for bankruptcy. Baron and Morovitz were then told by FS&T that it was doubtful that there was insurance coverage for their wrongful termination claims. FS&T recommended that they accept settlements on their wrongful termination claims well below the worth of those claims because of the lack of insurance coverage.[1]
Smyly has since refused to (re)hire Baron and Morovitz. When confronted with the signed document outlining the terms of Baron’s leave of absence, Smyly has taken the position (on FS&T’s advice) that it is unenforceable.
In response to plaintiffs’ complaint, FS&T has counterclaimed against Morovitz and filed a third-party claim against Morovitz’ current attorney, Murray Reiser. FS&T claims as follows:
FS&T represented Morovitz in his claims against Brest from July 1990 through July 1993. A portion of that matter was settled in the fall of 1992. At the time of the settlement, Morovitz voiced displeasure over the work of one of the FS&T attorneys on the case. FS&T then told Morovitz that substantial work still needed *17 to be done on other claims he had against Brest,[2] that if Morovitz was dissatisfied with FS&Ts representation of him he must let them know immediately, that they would withdraw if Morovitz was dissatisfied, and that they would not perform the substantial work remaining unless Morovitz had confidence in FS&T. Morovitz then allegedly told FS&T that he was satisfied with their work and that he wanted FS&T to continue representing him.
At the time he made these statements, FS&T contends that Morovitz had already retained attorney Murray Reiser to sue FS&T for malpractice. FS&T claims that, on Reiser’s advice, Morovitz deliberately misled FS&T as to his satisfaction with their work so that they would continue to represent him and perform substantial hours of legal services before the malpractice suit was filed. Thus, according to FS&T, Morovitz and Reiser would reap the benefit of FS&Ts legal work without paying for it.
FS&T continued representing Morovitz until shortly after a court hearing in July 1993. Upon being told that they would be sued, FS&T withdrew from representing Morovitz. FS&T claims that Morovitz told them that he and Reiser had been planning to bring suit against FS&T “for months” prior to actually notifying them of the suit.
Discussion
I. Plaintiffs’ claims against FS&T for misrepresentation
Plaintiffs’ complaint states a claim against FS&T for misrepresentation. FS&T argues that the complaint does not allege the making of any false statement of fact. The alleged false statement was the assertion by an FS&T attorney that Brest had $1,000,000 in insurance coverage available to satisfy plaintiffs’ claims for wrongful termination.[3] The complaint does effectively allege that this statement was false when it alleges that an FS&T attorney later told them that such coverage was not available.[4]
FS&T’s alternative argument, that the false statement caused plaintiffs no damage, is also unpersuasive. Plaintiffs claim that they took crucial and irretrievable steps in reliance on the assurance that coverage for their claims was available. Those steps included Morovitz confronting his superiors at Brest with evidence of odometer tampering, both plaintiffs pressing wrongful termination claims against Brest, providing FS&T and Smyly with the information against Brest that FS&T and Smyly needed for other purposes, and cooperating with the orchestrated media campaign against Brest. Plaintiffs’ complaint alleges that their participation in these events cost Morovitz his job at Brest, resulted in plaintiffs’ inability to obtain employment elsewhere in the industry, and destroyed Brest’s ability to pay any judgment to plaintiffs. These allegations, which the court must accept as true for purposes of the present motion, are sufficient to state that their reliance on the allegedly false statement caused them damage.
II. Plaintiffs’ claims against FS&T for civil conspiracy
To make out a civil claim for conspiracy, plaintiffs must first show that defendants combined to accomplish an unlawful purpose or that they combined to accomplish a purpose not unlawful by unlawful means. FS&T argues that its alleged actions had lawful purposes, namely to obtain information to further the interests of the class action plaintiffs against Brest and to further Smyly’s competitive position against Brest. They further argue that the complaint does not describe any unlawful means. They finally argue that the only person or entity that could possibly have suffered damage from this alleged combination was Brest, not the plaintiffs.
Plaintiffs counter with the argument that FS&T conspired with Smyly to deprive them of their employment contracts with Smyly. Although the complaint is somewhat vague as to FS&T’s involvement in, for example, preparing the unenforceable documentation for Baron’s leave of absence, the complaint does allege that FS&T joined with Smyly in assuring plaintiffs that they would have secure employment, in then advising plaintiffs that their employment with Smyly needed to be postponed to prevent Brest’s own suit for conspiracy, and in assuring plaintiffs that the employment contracts would ultimately be honored. Plaintiffs allege they were told by Smyly that FS&T was “in control” of their employment situation at Smyly and had “planned all of this.” In short, the complaint does adequately allege a combination between FS&T and Smyly for the wrongful purpose of defrauding Baron and Morovitz.
Alternatively, the court is also satisfied that the complaint alleges the use of wrongful means in obtaining information. While the purpose of discovering evidence to help one client, or discovering evidence of a competitor’s wrongdoing, is a lawful purpose, obtaining such information by betrayal of client confidences constitutes the use of unlawful means. Taking all of the allegations in plaintiffs’ complaint as true (which the court must do for purposes of the present motion), the complaint describes a purposeful scheme by which Smyly and FS&T set out to obtain information from Baron and Morovitz by way of an abuse of the attorney-client relationship and then to use and/or disclose that information in various ways to further their own interests, contrary to the interests of the clients Baron and Morovitz. When Baron and Morovitz voiced concerns about the way they were being used by FS&T and Smyly, those concerns were then assuaged by fraudulent assurances about secure employment with Smyly and assurances about their prospects of collecting on their own claims against Brest. FS&T is alleged to have participated in both the wrongful disclosure of confidential client information, *18 the giving of advice contrary to the interests of Baron and Morovitz so as to advance the interests of other FS&T clients, and in the fraudulent promises of employment at Smyly. The complaint unquestionably alleges that plaintiffs suffered damage as a result of this scheme.
III. Claims against Morovitz and Reiser
Reiser and Morovitz have moved to dismiss all of FS&T’s claims against them. In opposition to these motions, FS&T argues that the facts alleged in the counterclaim and the third-party complaint would give rise to claims of breach of contractual covenant of good faith and fair dealing, fraud, intentional interference with contractual relations, unjust enrichment and unfair and deceptive trade practices (G.L.c. 93A).[5]
A necessary element on each of these theories would be some form of damage to FS&T. The only damage alleged is damage to FS&T’s receipt of payment for the services it rendered to Morovitz after Morovitz’ allegedly false statements about his satisfaction with FS&T’s work.[6] Indeed, the allegedly wrongful nature of Morovitz’ and Reiser’s acts is that they ostensibly sought to obtain FS&T’s services without paying for them.
However, no matter how liberally FS&T’s pro se pleadings are construed,[7] such damage is simply not present as a matter of law. FS&T retains all its rights (including its lien under G.L.c. 221, §50) to be compensated for services rendered to Morovitz. Nothing in Morovitz’ statements to FS&T or in Reiser’s alleged advice to Morovitz on the subject can take away or diminish that right. The motions to dismiss both acknowledge that, when and if any recovery is received, FS&T may pursue its claim for the fair value of any services it rendered that helped lead to that recovery. Nothing has been done in derogation of FS&T’s ultimate right to compensation for services rendered.
The pleadings also fail to state (and it is apparently undisputed) that Morovitz has not obtained any recovery on his claims (beyond the initial settlement of a portion of his claims when FS&T still represented him). FS&T’s original agreement with Morovitz was for a contingency fee, with no fees being owed unless and until monies were actually recovered.
FS&T argues that it is presently owed for its services, notwithstanding that no recovery has been had.[8] First, it contends that upon discharge, the obligation to pay for services rendered to date is immediately due and payable. Such an interpretation of the contingent fee contract is completely contrary to established practice. When an attorney with a contingent fee agreement is discharged, the attorney retains only a quantum meruit claim for the fair value of services rendered. See Salem Realty Co. v. Matera, 384 Mass. 803 (1981) (rescript opinion). However, determination of that fair value must (and does by ordinary procedures used in this court) take into account the actual results achieved. See Elbaum v. Sullivan, 344 Mass. 662, 666-67 (1962); Cummings v. National Shawmut Bank, 284 Mass. 563, 569 (1933). Since the amount that is owed to a discharged attorney can not be determined until the results of the case are known, it can not be determined and paid when there is not yet any result.[9]
FS&T next argues that, whatever rights Morovitz might have had to postpone payment until recovery, he has forfeited those rights by his own breach of the covenant of good faith and fair dealing. The theory is somewhat circular when applied to the bad faith act that has been alleged in this case. The alleged “bad faith” is the supposed intent to deprive FS&T of its ultimate payment, a deprivation that Morovitz simply has not caused and could not cause byway of anything he may have said to FS&T. If the alleged misrepresentations can not deprive FS&T of its rights to payment for fair value of its services, they can not be treated as a “bad faith” attempt to avoid future payment that would allow FS&T to claim for immediate payment.[10]
FS&T’s claims also operate from the mistaken premise that it had some right to withdraw from its representation of Morovitz. It can not claim that it was fraudulently induced to continue representing Morovitz when it already had an ethical obligation to do so. FS&T alleges that it insisted on Morovitz’ giving them assurances that he was satisfied as a condition of its continued representation of Morovitz. Unless and until Morovitz discharged them, or unless and until the court allowed a motion to withdraw, FS&T had a contractual and ethical obligation to zealously represent Morovitz’ interests. FS&T can not complain of damage flowing from its continued representation of Morovitz.
Framed as claims against attorney Reiser, FS&T’s theories fare no better. Reiser has done nothing in his advice to Morovitz that would impair FS&T’s right to payment. With no recovery had on the case, Reiser has not obtained any benefit for himself without paying FS&T. Reiser’s opposition to the motion also recognizes that, in the event of any recovery, FS&Ts work that contributed to that result will have to be compensated.
Inasmuch as FS&T’s claims are defective as a matter of law, it is not necessary to address in depth the many troublesome policy ramifications of allowing such claims to go forward. Beyond the obvious right of a client to discharge his attorney at any time for any reason or for no reason, a right which the court must uphold in all respects, the court must also recognize that a dissatisfied client is not normally in a position that would allow him to dispense with his lawyer immediately at the first sign of trouble. The client needs to find another lawyer, and needs to form some new strategy, both as to the original underlying litigation and as to any claims he may have against his original attorney. While entertaining grave doubts about his desire to stay with his original lawyer, a client *19 still depends on that original lawyer to represent his interests. A client who is dissatisfied with his current lawyer faces a terrible predicament, and considerable time may elapse before the client has alternatives in place such that he can safely discharge his original attorney. When that same lawyer tells the client that he will withdraw from representation unless the client assures him that the client is satisfied with his work, the client is truly caught on the horns of a dilemma. If the client gives the requested assurances so as to avoid being abandoned, FS&T would claim that that client can be sued for fraud, bad faith, etc. If the client refuses to give those assurances, he faces a host of other hazards to his rights in the underlying litigation, hazards that he can not assess or handle on his own. The difficult decisions and choices that a client must make when he or she feels dissatisfied with an attorney ought not be further burdened with the potential of a fraud suit brought by the attorney.
As a matter of policy, a court must also recognize that a second attorney giving advice to that potential client has an obligation to that client, not to former counsel. That second attorney should feel free to give the client candid advice about his rights and options, including the option of suing his original counsel, without fear of being sued for interference with contractual relations, fraud, etc.
Recognition of the claims asserted by FS&T would also allow the original lawyer, when later being sued for malpractice, to force the withdrawal of the client’s chosen successor counsel, forcing the client to find yet a third lawyer. Strategies aimed at depriving one’s opponent of his chosen counsel are to be looked at with great disfavor. See Borman v. Borman, 378 Mass. 775, 787 (1979); Serody v. Serody, 19 Mass.App.Ct. 411, 414 (1985). It would also be extraordinarily difficult for the client and successor counsel to defend against such claims without waiving the attorney-client privilege, thus giving the original lawyer, now being sued for malpractice, information and documents to which he would otherwise not be entitled.
In short, in addition to the legal defects in FS&T’s claims, this court would be reluctant to recognize such claims absent the most compelling reasons, as the pursuit of such claims would have many troubling ramifications for the overall well-being of the attorney-client relationship. The pecuniary interests of a law firm, or even of the bar in general, are always subordinate to the interests of clients under our ethical rules.
ORDER
For the foregoing reasons, defendant Flynn, Sheridan and Tabb’s motion to dismiss is DENIED; plaintiff Alan Morovitz’ motion to dismiss counterclaim is ALLOWED; and third-party defendant Murray Reiser’s motion to dismiss third-party complaint is ALLOWED.

 Another Brest policy was located that would at least arguably provide coverage for defamation claims, but not for claims of wrongful termination.

Although not spelled out, this further work appears to relate to pursuing a claim for defamation so as to reach the other Brest policy.

Plaintiffs’ opposition to FS&Ts motion to dismiss concedes that FS&Ts assertion that the wrongful termination claims were worth $1,000,000 is a statement of opinion, not a statement of fact. Plaintiffs’ claims for misrepresentation are not based on anything more than the alleged statement about Brest’s insurance coverage.

Nile complaint further explains that, having originally told him that his suit was worth $1,000,000, FS&T advised Baron to accept a settlement of only $150,000 because “the insurance coverage he had earlier assured existed was, in fact, of doubtful existence.” ¶83.

Some of these theories are specifically mentioned in the pleadings. Others are identified in the oppositions to the motions to dismiss.

FS&T acknowledges, as it must, that Morovitz had the right to discharge FS&T at any time for any reason or for no reason at all. It can not claim any damage from Morovitz’ ultimate decision to discharge the firm.

The customary latitude given to pro se pleadings is probably not appropriate when the party representing itself is a law firm.

Nowhere in the counterclaim against Morovitz does FS&T actually assert a contract claim or quantum meruit claim for the services rendered. All of the claims, as described in the counterclaim and in the opposition to motion to dismiss, are for various torts.

Allowing a lawyer to claim for immediate payment whenever the lawyer is discharged from a contingent fee case would also be contrary to public policy. A client has the absolute right to discharge his attorney at any time for any reason or for no reason at all. If discharge of one’s attorney had the consequence of converting an obligation to pay only in the event of a recovery to an immediate obligation to pay an unknown amount even though no recovery has been had, that consequence would improperly burden the client’s paramount right to discharge his attorney.

In Salem Realty, supra, the Supreme Judicial Court left open the question whether even bad faith on the part of the client would allow an attorney to recover on the contingent fee agreement itself rather than on quantum meruit. 384 Mass, at 804. Nowhere does Salem Realty even suggest that the Supreme Judicial Court would allow an attorney to recover payment in the absence of the stated contingency in the agreement.